# UNITED STATES BANKRUPTCY COURT
# FOR THE
# WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TONY DIAN PERKINS | ) | CASE NO.: 16-10383(1)(12) |
| | ) | |
| and | ) | |
| Debtor(s) | ) | |

## MEMORANDUM-OPINION

This matter came before the Court for an evidentiary hearing on the Objection of Creditor Branch Banking & Trust Company ("BB&T") to Confirmation of the Amended Chapter 12 Plan of the Debtor Tony Dian Perkins ("Debtor" or "Dian"). The Court considered the documentary evidence submitted by the parties, the testimony of the witnesses, Kenneth Andrew Perkins and Debtor and the comments of counsel for the parties. For the following reasons, the Court overrules the Objection of BB&T and by separate Order will confirm Debtor and her son's Amended Chapter 12 Plans.

## PROCEDURAL AND FACTUAL BACKGROUND

In 1948, Debtor's grandparents moved to the property that Debtor currently farms in Logan and Simpson Counties, Kentucky. The property consists of 200 acres of prime, river bottom farmland. Debtor's grandfather left the property to Debtor's parents who continued the farming operation. When Debtor and her husband married in 1970, they went into partnership with her parents to farm the property. They built a home on the property and resided there until the residence was destroyed by a tornado in 2013. In addition to farming, Debtor also held a teaching job from

which she retired in 2015 to take care of her husband who is seriously ill.  Debtor has been involved with farming since 1970.

Debtor was a partner in two farming partnerships, Perkins and Perkins Farms and Rolling Ridge Farms.  Both partnerships filed Voluntary Petitions seeking relief under Chapter 11 of the United States Bankruptcy Code on April 16, 2015.[1]  After the Debtor substantially liquidated all of the assets in the two partnership cases, the Court dismissed both cases.  Debtor, however, still holds debts based on her partnership liabilities and individual guarantees.  Due to the liquidation of the equipment and real estate, Debtor incurred significant tax liability for the tax year ending December 31, 2015.

Debtor and her son, Kenneth Andrew Perkins ("Andy"), each filed their own individual Chapter 12 cases to deal with the remaining partnership debts.  Andy's Plan is dependent upon this Court confirming Debtor's Amended Chapter 12 Plan.  Therefore, the Court held an evidentiary hearing to first address the objections of Creditor BB&T to Dian's Amended Plan.  If Debtor Dian's case is confirmed, Andy's case will be confirmed.

Dian and Andrew had farmed in large scale approximately 9,500 acres through the different partnerships for many years.  The Rolling Ridge partnership was made up of Andy, his wife and Dian.  The Perkins and Perkins partnership consisted of Andy, Dian and Whitlock Farms.[2]  BB&T was the primary lender to the partnerships since 2009.  The partnerships had been able to keep up

---

[1] Both cases were filed in the Bankruptcy Court for the Western District of Kentucky, *In re Perkins and Perkins Farms*, Case No. 15-10383 and *In re Rolling Ridge Farms*, Case No. 15-10384.  The Rolling Ridge case was filed on April 16, 2015 and closed on May 10, 2016.  Perkins and Perkins Farms was filed on April 16, 2015 and dismissed January 12, 2016.

[2] Whitlock Farms partnership consisted of Dian and Andy.

-2-

with the debt service payments to BB&T until 2014.  At that time, BB&T and the partnerships began discussions to downsize the operations.  The crop inputs that year were high and the crop prices were low making it difficult for the partnerships to meet their financial obligations to BB&T.  Since the filing of the Chapter 12 Petitions, BB&T has been paid approximately $4 million from sale proceeds from the sale of Debtors' farm equipment, property and the harvesting of crops.

Debtor's husband had helped with the farming operation until he became seriously ill in 2008.  Dian's role in the farming operation consists of discussing inputs with Andy, pricing and where to sell grain, moving equipment, as well as managing and paying migrant farm laborers.

Since the winding down of the partnerships, Debtor is in charge of the grain farming operation.  Although Dian and Andy discuss decisions, ultimately it is Dian's money and her management decisions that operate the farm.  She has hired help to harvest the crops.

BB&T has a claim in the amount of $124,160.84 secured by Dian's residence that has a current value of approximately $213,000.  Dian has a one-half interest in the residence.

BB&T also has a claim secured by a real estate mortgage on 200 acres.  Debtor estimates the value of the acreage at $2 million.  Debtor estimates that after the sale of the equipment and Andy's residence, which will be sold to satisfy debt to BB&T, the claim is approximately $1,231,000, fully secured.  Debtor's Amended Plan proposes to pay this claim with 20 annual installments of $94,500 with interest at 4.5%.

In 2015, Debtor's corn yield was 190 bushels per acre, which is an average amount.  In the past, the operation has averaged between 180 to 190 bushels per acre.  The corn crop yielded total sales of $281,200.  The crop also yielded 45 bushels per acre for soybeans, which is also an average yield.  The soybean crop yielded total sales of $153,900.

For 2016, Andy testified that they had 25,000 bushels of corn and 10 bushels of soybeans per acre under contract. Corn sold for $3.90 to $4.00 per bushel and soybeans averaged $9.75 per bushel. The estimated yield for corn is 185 bushels which would result in $395,437.50 and the soybeans have an estimated yield of 60 bushels which would result in $245,700 in proceeds. The total sales, with the insurance, proceeds from the wheat crop, is estimated to be $726,137.50. Due to an overly wet fall, they could not plant wheat and received $85,000 from crop insurance.

Debtor estimates that her total future annual operating expenses are $554,870. Debtor will make a payment to BB&T on this secured claim in the amount of $94,500 one year from the date that the Amended Plan is confirmed. Debtor proposes a payment in January 2017 to secured creditor Crop Production Services in the amount of $64,500 for a total on mortgage payments and/or Contract for Deed payments of $159,000. The grand total for operating expenses and payments on secured debt total $738,870.

The Debtor also estimates that including her gross income from non-farm sources, which include annuities and pensions of $84,000 and net income from farming operations, less estimated federal, state and local taxes and living expenses, Debtor will have approximately $18,950.63 in disposable income to devote to unsecured claims.

By using Andy as her farm manager, Debtor will save approximately $80,000 a year. Normally she would pay a manager between $120,000-$130,000 for a farming operation of her size. Andy has a degree in agriculture and is the fourth generation to farm this property. Over the past 35 to 40 years, a member of Debtor's family has farmed the land. If Debtor's Amended Plan is confirmed, Debtor intends to plant wheat and a double crop of beans. The wheat crop for 2017 will

be planted once the Amended Plan is confirmed. Debtor and her son predict the wheat crop would make approximately $120,000.

Debtor leases farmland owned by three individuals, in addition to the acreage she owns. The leased land is owned by close family friends and family members. There are no written property leases. Under the oral leases, Debtor pays the Diddles $40,000 per year, the Kingtons $56,500 per year and Purdue $75,000 per year. Two of the three leaseholders are ages 84 and 86. The third is age 61. Debtor is assured by these individuals that these Leases will continue despite the fact they are not in writing.

Crop Production Services ("CPS") has a junior lien on the Debtor's 200 acre farm and a first mortgage on a 1.5 acre tract of land. CPS' claim totals $862,365.75. CPS will also be paid in 20 annual installments of $65,344.72, with the first payment to be made six months after the Amended Plan's confirmation, earlier than BB&T.

Security Seed has a first lien secured by Debtor's 2016 crop. The claim is worth $100,000 and Debtor proposes to pay the claim according to contract on or before December 31, 2016 as an operating expense.

Debtor also owes a secured claim to Links at Gulf Shores, Ltd. Partnership, secured by a condominium. Debtor proposes to pay this claim out of exempt funds.

Debtor also owes $113,071.12 in tax debt to the IRS arising out of the 2015 liquidation of the partnerships. The Amended Plan proposes to pay this claim in semi-annual installments with the first payment of $12,563.47 to be made on January 15, 2017, the second on July 15, 2017, until the claim is paid in full.

Debtor and Andy borrow equipment from neighbors and friends to harvest their wheat crop. In return, Andy assists them with tasks on their farms. This agreement has worked well for all involved for the past several years and there is no reason to believe this will not continue in the future.

## **LEGAL ANALYSIS**

BB&T objects to confirmation of Debtor's Amended Plan. BB&T's initial objection is that Debtor is not a "family farmer" as defined in 11 U.S.C. § 101(18) and that her aggregate debt exceeds the limit set forth in 11 U.S.C. § 101(18)(A). As such, BB&T contends Debtor is not eligible for relief under Chapter 12 of the Bankruptcy Code.

### A. **Debtor is a "Family Farmer".**

Only a "family farmer or family fisherman with regular annual income may be a debtor under chapter 12 of this title." 11 U.S.C. § 109(f). The term "family farmer" is further defined in 11 U.S.C. § 101(18), in pertinent part as follows:

> (A) individual or individual and spouse engaged in a farming operation whose aggregate debts do not exceed $4,031,575 and not less than 50 percent of whose aggregate noncontingent, liquidated debts (excluding a debt for the principal residence of such individual or such individual and spouse unless such debt arises out of a farming operation), on the date the case is filed, arise out of a farming operation owned or operated by such individual or such individual and spouse and such individual or such individual and spouse receive from such farming operation more than 50 percent of such individual's or such individual and spouse's gross income for –
>
> > (i) the taxable year preceding; or
> >
> > (ii) each of the 2d and 3d taxable years preceding the taxable year in which the case concerning such individual or such individual and spouse was filed;

-6-

11 U.S.C. § 101(18)(A). Thus, in order to be eligible under this statute, Debtor must have received more than 50 percent of her income from the farming operation in either Debtor's most recent tax year, 2015, or in each of 2014 and 2013.

Debtor's 2015 income tax return showed her gross income included $279,008 from her crops, $200,468 from Perkins and Perkins general farming partnership and $463,770 from Rolling Ridge Farms, a general farming partnership. Debtor also includes capital gains of $161,571 which resulted from the liquidation of farm assets. Debtor's return also showed $56,592 in wages, $1,400 in tax refunds, $59,801 from pensions and annuities and $14,567 in social security disability benefits.

Using these figures it is clear that Debtor meets the requirement of 11 U.S.C. § 101(18)(A) because more than 50 percent of her income was received from her farming operations. BB&T, however, contends that Debtor cannot use funds received from the farming partnerships because these operations are distinct and separate farming operations from Debtor's farming operation.

The Bankruptcy Code specifically defines the term "farming operation" to include "farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state." 11 U.S.C. § 101(21). This definition is to be construed liberally in order to further Congress' purpose of helping family farmers to continue farming. *In re Watford*, 898 F.2d 1525, 1527 (11th Cir. 1990).

This Court previously adopted a broad view of what constitutes a "farming operation" in *In re Williams*, Case No. 15-11023, 2016 Bankr. LEXIS 1804 (Bankr. W.D. Ky. Apr. 22, 2016) and believes that broad application applies to the case at bar.

BB&T contends *Williams* does not apply here because Debtor's income is insufficient under this statute. However, the Debtor's farm income is not insufficient if the capital gains from the sale of farm assets is included in the equation. The inclusion of these funds may be included as farm income. *See*, *In re Coulston*, 98 B.R. 280, 282 (Bankr. E.D. Mich. 1989). Using this "totality of the circumstances" approach furthers Chapter 12's purpose which is to "allow a class of debtors in an industry plagued by inherent and wide-ranging ups and downs the same chance at reorganization as small businessmen and individuals." *Id.*

To analyze the "farm income" requirement, the Court must first determine the amount of the Debtor's gross income during the relevant tax year and then determine the portion of that income attributable to the farming operation. 2 COLLIER ON BANKRUPTCY ¶ 101.18[6] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2016). The Bankruptcy Code does not define "gross income". Most courts use the Tax Code definition for eligibility requirements under Chapter 12. *See*, *e.g.*, *In re Fogle*, 87 B.R. 493, 496 (Bankr. N.D. Ohio 1988) and *In re DeGour*, 478 B.R. 1, 5 (Bankr. C.D. CA 2012) and cases cited therein. This Court agrees with the majority position that "gross income" means "all income from whatever source derived, including (but not limited to) . . (2) gross income derived from business." 26 U.S.C. § 61(a)(2). In *DeGour*, the court included in a debtor's gross income, income from a Subchapter S corporation owned by the debtor to determine whether the debtor qualified as a family farmer. The income was attributed to the debtor because the income passed through the corporation to the shareholders. This pass through income was from the debtor's marketing company, whose work was unrelated to the farming operation.

Here, the income at issue should be included in Debtor's gross income. Unlike in *DeGour*, however, the income is from one of the Debtor's farming operations. Inclusion of this pass through income meets the income eligibility requirements for the Debtor to file under Chapter 12.

BB&T has not provided the Court with legal support for its position that Debtor cannot include the pass through income from the farming partnerships of which she was a partner. Debtor had to personally pay income tax for this pass through income and it would be inequitable to not allow this income to be included for eligibility requirements. Debtor's farm income meets the eligibility requirements under 11 U.S.C. § 101(18).

### B. **Debtor's Debt Total Meets the Requirements for Chapter 12.**

A debtor engaged in a farming operation is eligible for Chapter 12 if their aggregate debts do not exceed $4,031,575. 11 U.S.C. § 101(18)(A). Debtor's scheduled debt totals $3,513,803.72 and is within the eligibility requirements. Sixteen Proofs of Claim were filed by the Bar Date established by the Court, for a cumulative total of $4,012,927.16. If the Court were to use either the Debtor's scheduled debts or the timely Proofs of Claim, the Debtor would qualify for Chapter 12. Nevertheless, BB&T believes the Debtor exceeds the debt limit by arguing that adding the scheduled debt to the Claim debt is appropriate.

Case law on eligibility requirements under Chapter 12 is scarce, particularly in the Sixth Circuit. Case law reveals that the date on which the aggregate indebtedness limitation is to be calculated is the date of the commencement of the case. *In re Cross Timbers Ranch*, 151 B.R. 923 (Bankr. W.D. Mo. 1993); 2 COLLIER ON BANKRUPTCY ¶ 101.18[3] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2016). *See also In re Quintana*, 107 B.R. 234, 236 n2 (B.A.P. 9th Cir. 1989). In determining the amount of the Debtor's outstanding debts, the Debtor's schedules should be

accorded *prima facie* validity. If the schedules are filed in good faith, it creates a rebuttable presumption as to the Debtor's indebtedness, which can be overcome by evidence controverting the schedules. *In re Labig*, 74 B.R. 507 (Bankr. S.D. Ohio 1987). In *Labig*, the court stated that the Sixth Circuit has stated that in the context of Chapter 13, eligibility should normally be determined by debtor's schedules, checking only to see if they were made in good faith, citing *Matter of Pearson*, 773 F.2d 751, 757 (6th Cir. 1985). *See also*, *In re Carpenter*, 79 B.R. 316, 320 (Bankr. S.D. Ohio 1987) (" . . . the debtor's good faith indication of its debts generally establishes its eligibility for relief under a specific chapter of the Bankruptcy Code rather than the assertions of creditors by way of claims.") Under this line of authority, the Debtor prevails.

After presentation of Debtor's case on the debt limit issue, it was incumbent upon BB&T to rebut the presumption of accuracy of the debt represented on the Debtor's schedules. Here, BB&T pointed to the Court's record, arguing reliance upon the scheduled debt understated the Debtor's aggregate debt under 11 U.S.C. § 101(18)(A). The records BB&T points to are the 16 Proofs of Claim filed against the Debtor after the filing of the Petition, which if added to scheduled debt cause the Debtor to exceed the debt limit. The Court notes that not all scheduled creditors filed Proofs of Claim and not all claimants filing Proofs of Claim were scheduled.

The Court has reviewed the authority cited by BB&T, *In re Clark*, 550 B.R. 429, 433 (Bankr. N.D. Ind. 2016), which held that the Court could look beyond the schedules to determine eligibility on the debt limit for a Chapter 12 debtor. The Court, however, was not presented, nor has the Court located, prevailing Sixth Circuit authority on this issue.

BB&T argues the Debtor's substantial tax liability arising from the liquidation of her other partnerships should be taken into consideration by the Court. Debtor failed to schedule the tax debt

-10-

but the IRS filed claims and the Debtor's Amended Plan included said debt.  The Amended Plan of the Debtor states Debtor owes $113,071 to the IRS and proposes to pay it in semi-annual installments with interest at the government rate.  Even including the IRS liability of $113,071 as Debtor's stated tax liability, Debtor is still under the eligibility debt limit for Chapter 12 if the Court uses the scheduled debt only.  Yet, if the Court were to use BB&T's analysis of including the amounts of the Proofs of Claim, as well as the $640,408 of unsecured debts for which no Proofs of Claim were filed, Debtor is over the limit.

The Court finds it inequitable to use the amounts on the Proofs of Claim, as well as the scheduled amounts on which no Proofs of Claim were filed.  In Chapter 12 cases, an unsecured creditor must file a timely proof of claim in order to participate in the distributions.  Fed. R. Bankr. P. 3002(a); *In re Boudinot*, 237 B.R. 413 (Bankr. S.D. Ohio 1999).  Congress could not have intended the debt limit determination to include the tortured analysis put forth by BB&T.  Including debts scheduled but not allowed, to claims filed to determine eligibility, amounts to "cherry picking" to the disadvantage of the Debtor.  Absent evidence of bad faith and clear mandatory precedent directing otherwise, the Court determines it has the discretion to use the Petition date to determine aggregate debt limit eligibility.

BB&T has not challenged the Debtor's good faith in preparing the schedules and the Court has no reason to question Debtor's good faith.  Considering there was no challenge raised to the Debtor's good faith in the filing of the Schedules, as well as the lack of Sixth Circuit precedent on this issue, the Court believes the purpose of Chapter 12[3] is best furthered by using the Debtor's

---

[3]Congress enacted Chapter 12 in "response to the agricultural debt crisis of the mid-1980's," *Traders State Bank v. Mann Farms, Inc.*, 917 F.2d 1210, 1214 (9th Cir. 1990), and in order "to enable family farmers to retain their farms while reorganizing their financial affairs."

-11-

scheduled debt in determining her Chapter 12 eligibility. Under this analysis, Debtor meets the statutory debt limit. This analysis also meets the stated goal of Chapter 12 and its deference to family farmers.

### C. The Amended Chapter 12 Plan is Feasible.

The burden of proving feasibility under a Chapter 12 Plan is on the debtor. 11 U.S.C. § 1225(a)(6). One of the requirements for feasibility is that the debtor prove it "will be able to make all payments under the plan and to comply with the plan." *Id.*

Debtor's Amended Chapter 12 Plan proposes to pay BB&T annual payments of $94,500 over 20 years with interest at 4.5%. BB&T objects to its treatment under the Amended Plan because it will not receive its first payment until a year after the Plan is confirmed and a junior lienholder, Security Seed, will be paid before it from crops grown on Debtor's land upon which BB&T holds a first mortgage.

The Court does not find BB&T's treatment under the Plan inequitable. Once Security Seed is paid, more money will be freed from the debt service that can be devoted to Plan payments. Furthermore, the evidence at trial showed that through litigation and settlements prior to Debtor's filing her Petition, BB&T received payments on its claims totaling approximately $4 million. It also is oversecured on its claims making the risk of nonpayment substantially less.

Debtor and Andy's testimony established that the crop production, including the predicted crop yields and inclusion of a wheat crop will adequately cash flow the Amended Plan. The Debtor

---

*In re Lockard*, 234 B.R. 484, 490 (Bankr. W.D. Mo. 1999). "Chapter 12 is intended to 'give family farmers facing bankruptcy a fighting chance to reorganize their debts and keep their land.'" *In re Buchanan*, 2006 WL 2090213, at 3 (M.D. Tenn. July 25, 2006) (quoting *In re Pianowski*, 92 B.R. 225, 232 (W.D. Mich. 1988).

-12-

has substantially pared down her operation and with her corn yields and double crops of soybeans, Debtor demonstrated that under the Amended Plan, she should be able to make the payments proposed under the Plan.

BB&T objects to Debtor's predicted crop yields, farming and the projections under the Amended Plan are dependent on many variables. Given the long history of the Debtor's successful farming operations, the Court accepts the Debtor's proposed Amended Plan and its feasibility. The Amended Plan meets all elements of 11 U.S.C. § 1225. The Amended Plan also projects payment of approximately $94,000 to unsecured creditors, more than they would receive under a Chapter 7 case.

The Debtor requested the Court to take judicial notice of the current prime rate of interest of 3.5%, which is lower than the 4.5% proposed to pay BB&T's claim. The Court can take judicial notice of the interest rate by reviewing the rate currently listed in newspapers, such as the WALL STREET JOURNAL. The figure is not subject to debate and one that is amendable to judicial notice. Finally, the Court believes the 4.5% rate of interest is reasonable and BB&T has not presented any evidence to the contrary.

Given the fact that BB&T received substantial payments from the Debtor pre-petition and that it is oversecured by Debtor's property, the Court sees very little prejudice to BB&T by allowing Debtor an opportunity to perform under the Amended Plan. Whether Debtor and her son are able to succeed under the Amended Plan should be known in fairly short order. If Debtor fails, BB&T is in a better position than any other creditor. Balancing these interests, the Court finds the Debtor should be given an opportunity to perform the Amended Plan.

## **CONCLUSION**

For all of the above reasons, the Court **OVERRULES** the Objection of BB&T to the Amended Chapter 12 Plan of Debtor Tony Dian Perkins. An Order overruling BB&T's Objection accompanies this Memorandum-Opinion.

Joan A. Lloyd
United States Bankruptcy Judge
Dated: December 22, 2016

UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

IN RE: )
)
TONY DIAN PERKINS ) CASE NO.: 16-10383(1)(12)
)
Debtor(s) )

### ORDER

Pursuant to the Memorandum-Opinion entered this date and incorporated herein by reference,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the Objection of Creditor BB&T to Confirmation of the Amended Chapter 12 Plan of the Debtor Tony Dian Perkins, be and hereby is, **OVERRULED**.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Debtor Tony Dian Perkins and Debtor Kenneth Andrew Perkins (Case No. 16-10382) shall each tender Orders confirming their Chapter 12 Plans in accordance with the accompanying Memorandum-Opinion.

Joan A. Lloyd
United States Bankruptcy Judge
Dated: December 22, 2016